UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-20258-CIV-ALTONAGA/O'SULLIVAN

HAYAT AARRAS; et al,

      Plaintiffs,

vs.

TRUMP MIAMI RESORT
MANAGEMENT LLC, a foreign limited
liability company; et al.,

      Defendants.

_____/

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT TRUMP'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs, by and through undersigned counsel, for their memorandum of law in opposition to Defendant Trump Miami Resort Management LLC's ("Trump") Motion for Summary Judgment [ECF No. 221], state as follows:

### I.      Introduction.

In this case, Plaintiffs, who worked as banquet servers, cooks, action chefs, elevator operators, and banquet captains and supervisors during a 10-day 2014 Passover tour event held at the Trump National Doral Resort ("TND"), have sued Trump and other entities and individuals for unpaid minimum wages and overtime compensation under the Fair Labor Standards Act, 29 U.S.C. §§206(a) and 207(a) ("FLSA"). Plaintiffs have alleged and seek to prove in this case that Trump was their joint employer during the event, along with ASAI, Inc. ("ASAI"), the staffing company that directly hired Plaintiffs, and Eden Tours, LLC ("Eden Tours"), the tour operator that sponsored the event.

1

The only issue Trump has raised in its Motion for Summary Judgment is whether, based on the record evidence, there are genuine triable issues of fact as to Trump's status as Plaintiffs' statutory "employer", as that term is broadly defined and interpreted under the FLSA. As demonstrated by the evidence presented in support of Plaintiffs' separately filed Local Rule 56.1 Statement of Disputed Material Facts ("SODF"), and the arguments below, there are genuine issues of material fact as to Trump's joint employer status, and Trump's Motion should be denied.

## II.     Summary Judgment Standard.

Summary judgment is authorized only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). Summary judgment is appropriate only in circumstances where "the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party." *Id.*, 477 U.S. at 322-23.

On a motion for summary judgment, the Court may not make credibility determinations, weigh evidence, or decide which inferences to draw from the facts; these are jobs for a fact finder. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510 (1986); *Twiss v. Curry*, 25 F.3d 1551, 1555 (11th Cir. 1994). Thus, if the record presents factual issues, the trial court must not decide them; instead, it should deny the motion and proceed to trial. *Burton v. Tampa Housing Auth.*, 271 F.3d 1274, 1277 (11th Cir. 2001); *O'Neal v. United States*, 258 F.3d 1265, 1270 (11th Cir. 2001); *Tullius v. Albright*, 240 F.3d 1317 (11th Cir. 2001). Essentially, "the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251.

The moving party bears the burden of proving that no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323. In determining whether the moving party has satisfied this burden, the trial court considers all inferences drawn from the underlying facts in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513; *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11ᵗʰ Cir. 1999). Likewise, all reasonable doubts about the facts are to be resolved in favor of the non-moving party. *Twiss*, 25 F.3d at 1555. "If reasonable minds could differ on any inferences arising from the undisputed facts, summary judgment should be denied." *Id*. Furthermore, "if a reasonable fact finder can draw more than one inference from the facts, and that inference creates a genuine issue of material fact," summary judgment is likewise improper. *Holifield v. Reno*, 115 F.3d 1555, 1561 (11ᵗʰ Cir. 1997); *Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11ᵗʰ Cir. 1988); *Twiss*, 25 F.3d at 1555 ("When more than one inference can be reasonably drawn, it is for the trier of fact to determine which one.").

Here and as demonstrated below, based on the record evidence, the sworn testimony presented by way of depositions, and the reasonable inferences to be drawn therefrom in Plaintiffs' favor, genuine, triable issues of material fact exist as to Trump's status as a joint employer of Plaintiffs within the broad coverage of the FLSA. Trump's Motion for Summary Judgment must be denied and this case allowed to proceed to trial.

### III.    The FLSA's extremely broad coverage scope of joint employment relationships.

The FLSA defines an "employee" as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and an "employer" as including "any person acting directly or indirectly in the interest of an employer in relation to an employee," 29 U.S.C. 203(d). The FLSA defines "to employ" as "to suffer or permit to work," 29 U.S.C. § 203(g).

The "suffer or permit" definition of employment is "the broadest definition that has ever been included in any one act." *U.S. v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945) (quoting statement of Sen. Hugo Black, 81 Cong. Rec. 7657 (1938)).   It encompasses "working relationships, which prior to [the FLSA], were not deemed to fall within an employer-employee category," *Walling v. Portland Terminal Co.,* 330 U.S. 148 (1947).   Indeed, the federal courts including the U. S. Supreme Court, have noted the "striking breadth" of the concepts of "employee", "employer" and "employ" under the FLSA, and that such concepts must be interpreted expansively.   *Nationwide Mutual Ins. Co. Darden,* 503 U.S. 318, 326 (1992) (discussing *Rutherford Food v. McComb,* 503 U.S. 722, 728 (1947)).   Such a broad reading of the FLSA definitions is required in order (1) to effectuate the remedial purpose of the Act which is "to eliminate low wages and long hours" and (2) to avoid "inviting adroit schemes by some employers'  to avoid the immediate burdens at the expense of the benefits sought by the [FLSA]." *Usery v. Pilgrim Equipment Co., Inc.*, 527 F.2d 1308 (5th Cir. 1976), *cert denied,* 429 U.S. 826 (1976).

The courts, as well as the U.S. Department of Labor as recently as January 26, 2016, in an Administrator's Interpretation of joint employment concepts under the FLSA, have recognized that "[t]he concept of joint employment, like employment generally, should be defined expansively under the FLSA." U.S.D.O.L. Administrator's Interpretation 2016-1 at p. 4 (Jan. 26, 2016)(quoting *Torres-Lopez v. May*, 111 F.3d 633, 639 (9th Cir. 1997)).  "Unlike the common law control test, which analyzes whether a worker is an employee based on the employer's control over the worker and not the broader economic realities of the working relationship, the 'suffer or permit' standard broadens the scope of employment relationships covered by the FLSA." *Id. See also Walling v. Portland Terminal Co.*, 330 U.S. 148, 150-51 (1947) (FLSA's definitions are

"comprehensive enough to require its application" to many working relationships which, under the common law control standard, may not be employer-employee relationships); *Darden*, 503 U.S. at 326 (FLSA's "suffer or permit" standard for employment "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles."). Thus, in analyzing a purported "joint employer" situation, "the expansive definition of 'employ' as including 'to suffer or permit to work' ... ensures that the scope of employment relationships and joint employment under the FLSA ... is as broad as possible." *Id.*

### IV. There are triable issues of fact that Trump was Plaintiffs' joint employer during the 2014 Passover tour event.[1]

#### A. The Eleventh Circuit's economic realities test for joint employer status.

To determine in the joint employer context whether an alleged employer "suffer[s] or permit[s]" an individual to work, [the Court must] ask "if, as a matter of economic reality, the individual is dependent on the entity." *Layton v. DHL Express (USA), Inc.,* 686 F.3d 1172, 1175 (11th Cir.2012) (11th Cir. 2012) (quoting *Antenor v. D & S Farms,* 88 F.3d 925, 929 (11th Cir.1996)). Courts should "examine the economic realities of the relationship among the workers, the contractor, and the [company]." *Beliz v. McLeod & Sons Packing Co.,* 765 F.2d 1317, 1327 (5th Cir. 1985). Workers are considered employees of a business to which they render service if, as a matter of economic reality, they are dependent on that business. *Id.*

In *Layton v. DHL Express (USA), Inc.,* supra, the Eleventh Circuit set forth the following eight factors to evaluate the existence of a joint employment relationship:

---

[1] Plaintiffs acknowledge that in their Amended Complaint they referred to Trump as being their joint employer under a "horizontal" joint employment relationship. However, the facts that were pled as factors in support of Trump's joint employer status were those the courts and the Department of Labor traditionally employ to analyze a "vertical" joint employment relationship. *See* Amended Complaint [ECF No. 83] at ¶70. Accordingly, Plaintiffs will not be conducting a "horizontal" joint employer analysis as the "vertical" analysis is more appropriate.

1)  the nature and degree of control of the workers;

2)  the degree of supervision, direct or indirect, of the work;

3)  the power to determine the pay rates or the methods of payments of the workers;

4)  the right, directly or indirectly, to hire, fire or modify the employment conditions of the workers;

5)  preparation of payroll and the payment of wages;

6)  ownership of the facilities where work occurred;

7)  performance of a specialty job integral to the business; and

8)  investment in equipment and facilities.

*Layton*, 686 F.3d at 1176 (citing *Aimable v. Long & Scott Farms*, 20 F.3d 434, 437-43 (11th Cir.1994)).

The Eleventh Circuit has further held that the following principles should guide any analysis of the eight factors:

> First, the question in õjoint employmentö cases is not whether the worker is more economically dependent on the í contractor or the [alleged employer], with the winner avoiding responsibility as an employer .... [T]he focus of each inquiry must be on each employment relationship as it exists between the worker and the party asserted to be a joint employer.

> Second, no one factor is determinative. As we explained in *Aimable,* the existence of a joint employment relationship depends on the economic reality of all the circumstances.

> Third, the factors are used because they are indicators of economic dependence. They are aids ô tools to be used to gauge the degree of dependence of alleged employees on the business to which they are connected .... Thus, the weight of each factor depends on the light it sheds on the [ ]workers' economic dependence (or lack thereof) on the alleged employer, which in turn depends on the facts of the case.

> Fourth, a joint employment relationship is not determined by a mathematical formula .... The purpose of weighing the factors is not to place each in either the contractor or the [alleged employer's] column, but to view them qualitatively to assess the evidence of economic dependence, which may point to both.

Fifth, in considering a joint-employment relationship, we must not allow common-law concepts of employment to distract our focus from economic dependency.

*Antenor,* 88 F. 3d at 932ó 33 (quotation marks and citations omitted).

Here, Plaintiffs concede that factors three and five of the eight õeconomic realitiesö factors are not in Plaintiffsø favor for a joint employer analysis under the FLSA.  However, as argued below, there is substantial record evidence in support of factors one, two, four, six, seven, and eight that weigh in favor of a finding that Trump was Plaintiffsø joint employer, and that, at the very least, establish the existence of triable issues of fact for the jury to decide at trial.

**B.      Nature and degree of control of the workers.**

õControl arises ... when the [purported joint employer] goes beyond general instructions ... and begins to assign specific tasks, to assign specific workers, **or** to take an overly active role in the oversight of the work.ö *Aimable,* 20 F.3d at 441 (emphasis added).   õThe Eleventh Circuit has stated that control over an employee by a putative employer exists when that employer determines the number of workers hired for a job, when work should begin on a particular day, which workers should be assigned to specific tasks and whether a worker should be disciplined or retained.ö *Tafalla v. All Florida Dialysis Services, Inc.*, 2009 WL 151159, at *6 (S.D. Fla., Jan. 21, 2009) (citing *Antenor,* 88 F.3d at 933).   Here there is ample record evidence that both Trumpøs managerial and banquet supervisory employees exercised substantial, even õoverly activeö, control over the service staff, including Plaintiffs, that included assigning them specific tasks, assigning them to work in specific jobs and at specific locations, preparing their work schedules, being involved and making decisions in the hiring process, and disciplining and terminating them.

Abraham Fuchs (õFuchsö), the Kosher caterer hired for the event, testified extensively that Trumpøs management, in particular Executive Chef Gregary Sgarro (õSgarroö) and Assistant

7

Director of Catering and Conferences Jennifer Santini ("Santini"), were actively engaged in managing and supervising the **entire** operations of the event, including the front of the house where the majority of Plaintiffs worked as servers.  SODF at ¶3(a).[2]  According to Fuchs, Sgarro created the entire system to manage the staff in the "back of the house" (i.e., the kitchen area), and for communicating how things were to be done with the "front of the house" (i.e., the guest/food service areas).  *Id.*

Fuchs further testified that Santini "ran the thing from top to bottom, start to finish"; that "[s]he was managing everyone at the event"; that "[t]here wasn't a thing that happened that she wasn't cc'd on and didn't get directly involved with"; that [s]he was there morning, day and night running the show", and that "any and all food and beverage departments, whether it was hotel with Chef Gregg or it was stewarding with the executive steward or was engineering, or was any arm of the hotel that was involved with food or beverage, she directed what needed to be done and how it needed to be done, with the […] front-of-the-house service."  *Id.*  Fuchs even testified that he personally observed Santini interacting with the banquet captains, the persons who directly supervised and controlled the service staff employees.  *Id.*

Although Fuchs did variously describe Santini's role as "fireman" or "troubleshooter", those labels are misleading in light of Fuchs' other testimony, as well as the testimony of other witnesses, as to what Santini actually did during the event.  Fuchs testified that Santini was actively

---

[2] Trump in its Motion asks this Court to dismiss and ignore Fuchs' testimony, but only to the extent it supports Plaintiffs' position that Trump was a joint employer, inasmuch as Trump relies on Fuchs' testimony for various facts that may be favorable to Trump.  *See* ECF No. 221 at p. 11 n. 1.  However, such a suggestion is improper on a motion for summary judgment where this Court cannot make credibility determinations, and is obligated to view the facts and record evidence, and all reasonable inferences to be drawn therefrom, in a light favorable to Plaintiffs.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255 (1986); *Twiss v. Curry*, 25 F.3d 1551, 1555 (11th Cir. 1994).

involved in controlling the work to be performed by the event service staff.  Specifically, Santini, via directions she would give to the banquet captains, including two Trump-employed banquet captains, Consuelo Garcia ("Garcia") and Renato Valencia ("Valencia"), would address the issues of getting food faster to guests, not getting cold food to the guests, and placing guests in spots that they were satisfied with.  *Id.* at ¶3(b).  Significantly, Santini also had the authority, and exercised it, to address the number of servers who were required during the event and to also determine what time servers would come to work at the event.  *Id.*  Santini was also involved in the decisions to have employees removed from the hotel property for disciplinary reasons, a process that involved the assistance of Trump's loss prevention personnel.  *Id.*  According to Fuchs, based on his personal knowledge, the decision maker for removal of event staff for disciplinary reasons was "the hotel," and that "[t]he only people who are empowered to bring loss prevention in and remove employees from a program is the hotel." *Id.*  Fuchs squarely testified that Santini had the authority to supervise and control the overall operations of the front the house – i.e., the service staff – and he personally observed her exercise that authority.  *Id.*

Santini's substantial exercise of control over the service staff and their functions was also testified to by Norman Goldwasser ("Goldwasser"), the operator of Eden Tours, LLC ("Eden Tours"), the Passover event's sponsor and organizer, and by one of the Plaintiffs, Jonathan Merrigan ("Merrigan").  Goldwasser testified that Santini would direct the wait staff "in the dining room in terms of making sure they're doing what they are supposed to be doing.  And if there were issues that came up, manage them.  *Id.* at ¶3(c).  According to Goldwasser, "if there was a problem – with some food service, she would go to the waiter and say, can you do this, can you do that." *Id.*  Goldwasser further testified that Santini would direct the servers "to do things, to -- to get things done, which was -- you know, that was what we did as part of the team." *Id.*  Goldwasser

testified that he personally observed Santini "directing" the wait staff on at least two occasions, and that he defined "directing" as "giving them orders, giving them direction in terms of how they should function in a specific situation." *Id.* Goldwasser also testified that based on his knowledge of Santini's role in the event and her involvement in the event in the dining room "day and night", Santini would interact with the wait staff "throughout the entire week." *Id.*

Plaintiff Merrigan testified that he was directly supervised and controlled by Garcia, the Trump banquet captain, and that Garcia took her directions from another female Trump manager. *Id.* at ¶3(i). According to Merrigan, Garcia informed him that this Trump manager was her "boss". *Id.* Although Merrigan could not recall the female manager's name, given Fuchs' and Goldwasser's testimony that Santini was present and in control throughout the event and that she would give directions and instructions to the banquet captains, including Garcia, it can reasonably be inferred that Garcia's "boss" from whom she would receive the instructions throughout the event was Santini. *Id.* at ¶¶3(a), (b) and (i).

In addition to Fuchs', Goldwasser's, and Merrigan's testimony as to Sgarro and Santini's highly active involvement in the event, Plaintiff Richard Johnson (Johnson") testified that he was assigned to work the linen supply room and was actively supervised and given directions by another Trump managerial employee, the Trump banquet director. *Id.* at ¶3(d). Johnson testified that he took various specific directives from the Trump banquet director who directly supervised Johnson's work and who Johnson considered his supervisor and direct report. *Id.* Such directives included assigning Johnson various specific tasks: having him designate the amount of linens to be distributed, directing Johnson when to distribute the linens, directing Johnson when to return the linens, providing Johnson with specific linen orders that Johnson was to fill, directing Johnson

what times he was to report to work, and ensuring Johnson that he was supplied with the right number of linens for the event. *Id.*

Johnson also testified, consistent with Fuchs' testimony, that, as one of the captains supervising the service staff during the event, he was also under the control of the Executive Chef. *Id.* at ¶3(e). Johnson testified that the Executive Chef would direct Johnson and his server team to secure certain dietary requirements and religious restrictions from certain VIP guests, which Johnson would then pass on to members of his team. *Id.* Johnson also testified that there were regular shift meetings presided over by the Executive Chef in which the Chef went over the menu each day and would give directives on what would happen each day and who to talk to if there were problems. *Id.*

Furthermore, Fuchs, Goldwasser, Merrigan, Johnson, and another Plaintiff, Erika Fonticiella ("Fonticiella"), all provided consistent testimony that the banquet captains, Garcia and Valencia – both of whom were regularly and throughout the year as Trump banquet captains – actively controlled, supervised and directed the work of the service staff employees. *Id.* at ¶¶3(f), (g), (h), (i), and (j). Johnson testified that Garcia would schedule the servers for times they had to work, would handle and supervise the server sign-in and sign-out sheets, would assign the servers to particular locations to perform their work, would tell the servers when they could take lunch and rest breaks, would communicate to the servers and other captains the rules of the event and what they could and couldn't do, and would prepare the guest seating charts and server station assignments. *Id.* at ¶¶3(f) and (g). Johnson also testified that Garcia and Valencia, like himself, had the authority to discipline staff members, that Valencia had sent two people home, and that Garcia along with the maître d' had escorted staff members off the premises. *Id.*

Fonticiella's involvement with Garcia was even more intimate and involved than Johnson. Fonticiella testified that during the event she worked "side by side" with Garcia out of Garcia's two offices at the hotel for which Garcia had a key -- one office located in the Legends Ballroom and the other located in the Ivanka Ballroom. *Id.* at ¶3(g). Fonticiella testified that in these offices, Garcia would use the office's computer and printer to create and print out seating charts and to prepare staff member schedules. *Id.* Fonticiella further testified that Garcia would give Fonticiella her assignments, would tell her when she would have to work, and would give her specific tasks and instructions, including taking things to guests in particular guest rooms at the hotel. *Id.*

Fonticiella also testified that Garcia was involved in the hiring process and in terminating staff members for the event. *Id.* at ¶3(h). Specifically, Fonticiella testified that Garcia was present and actively involved in the orientation session where prospective staff members were auditioned to determine who would serve in the core service groups and who would be relegated to lesser jobs. *Id.* At the auditions, Garcia was specifically introduced as a Trump banquet captain to the server group who attended, and she had a say in deciding who would be selected for the server positions. *Id.* Garcia also made the decision on her own to discharge a staff member named Julian after Fonticiella had complained to Garcia about his behavior. *Id.*

In addition to testifying that Garcia took her orders from a female Trump manager, Merrigan testified that Garcia actively participated in the auditioning process, and was instrumental in the decision making of hiring and work assignments. *Id.* at ¶3(i). According to Merrigan, Garcia gave the staff members specific instructions and directions on the hotel's rules and policies that had to be followed, told them she would be supervising them and assigning tasks, gave staff members their work assignments, prepared staff member schedules from her office located on the hotel premises using Trump computers and printer equipment, constantly directed

staff members on what had to be done, how things had to be done, and where to go and not go, and handled staff member daily sign-ins and sign outs. *Id.*   Like Fonticiella, Merrigan also testified that Garcia had terminated, on her own initiative, various staff employees, including Julian, the staff member Fonticiella had identified.  *Id.*

Merrigan also testified that Garcia, along with another Trump managerial employee, Allison Dlugatz ("Dlugatz"), were part of the decision-making process during the staff member pre-event auditions.  *Id.*  According to Satz, this auditioning process was instrumental in setting the servers' pay rates based upon whether they were selected for the core server groups or were relegated to lesser positions for the event. *Id.* at ¶3(k). Thus, based on Merrigan's testimony, both Garcia and Dlugatz were decision makers in the hiring and placement decisions of the service staff members, including Plaintiffs, which would have a direct impact upon how much they would be paid.[3] This is directly contrary to Trump's position that Trump management played no role in the hiring process and in the setting of service staff member pay.

In its Motion and accompanying Statement of Undisputed Facts ("SOF"), Trump makes an effort to disassociate Garcia and Valencia from their regular employment with Trump by selectively referencing certain deposition testimony, mainly that of Garcia and Valencia, that Garcia and Valencia were not acting as Trump employees during the Passover event because they had taken vacations from their normal jobs as Trump banquet captains and were being paid for their services by Satz and ASAI.  However, there is ample witness testimony, including that by Fuchs, Goldwasser, Johnson, Fonticiella, and Merrigan, that both before the event commenced and

---

[3] According to Satz, and contrary to the testimony proffered by Trump's managerial and supervisory employees, including Garcia and Valencia, the banquet captains, including Valencia, had a say in who would be selected and who would be assigned to specific jobs during the auditions. *Id.* at ¶3(k).

during the event, Garcia and Valencia had been introduced as Trump employees, had introduced themselves to the servers as Trump employees, held themselves out to the servers and others as Trump employees, regularly wore Trump uniforms that were different from those worn by the other captains, and wore name badges on their uniforms that were branded with the hotel's logo and information. *Id.* at ¶3(j).  Indeed, Garcia in her own deposition testified that Satz had introduced her to the service staff members as a Trump employee, and she did nothing to correct or clarify that introduction.  *Id.*

Furthermore, although Trump states in its SOF that Satz provided elevator operators for the event (SOF at ¶8), and employees such as Plaintiffs Jennifer Ermis and Eduardo Sabras did operate the elevators (SODF at ¶8), the actual contract between Eden Tours and Trump and Group Resume for the event, indicated that responsibility and control over the elevators was to be by Trump's Loss Prevention department.  SODF at ¶8.

Thus, there is substantial record evidence that Trump, through its management and supervisory personnel, regularly assigned various and specific tasks to the service staff members, determined the number of staff members who were needed, created the schedules for the staff members, set up the systems, rules and policies that the staff members had to follow throughout the event, gave the staff members instructions on how to follow them, would tell the staff members when and where they had to work, would tell the staff members how they had to perform their jobs and correct problems, would tell the staff members if and when they could take breaks, and had the requisite authority and were actively involved in the process of hiring and disciplining staff members.  This record evidence and testimony ó which is in direct conflict with evidence and testimony that Trump has proffered -- if presented to and believed by a jury, would support a finding that Trump exercised control over the staff members on daily basis throughout the event.

**C.**     **Degree of supervision of work.**

Supervision can be present regardless of whether orders are communicated directly to the alleged employee or indirectly through the contractor. *Aimable,* 20 F.3d at 441.  Here there is sufficient record evidence that Trump's managerial and supervisory employees took an active role in the supervision of the service staff, including Plaintiffs.  There is also record evidence that Trump indirectly, yet actively, supervised the staff through the directions and instructions given by Trump managerial employees to the banquet staff.

Here, as discussed fully above in connection with the "control" factor, Trumps' managers, in particular Sgarro, Santini, and the banquet director, daily supervised and managed the work of the service staff members, including Plaintiffs.  Fuchs, Goldwasser, Johnson, Fonticiella, and Merrigan all testified extensively as to the hands-on, regular, daily supervision these individuals exercised over the service staff members during the event.  SODF at ¶¶3(a), (b), (c), (d), and (e). Johnson, Fonticiella, and Merrigan also testified extensively as to the daily direct supervision they received from Garcia, who throughout the event was a Trump uniformed, badged, and branded supervisory employee, was introduced to them and others as a Trump supervisory employee, represented herself to them and others as a Trump supervisory employee, and who utilized specialized Trump banquet facilities such as its banquet offices with computer and printing equipment and to which she had a key.  *Id.* at ¶¶3(f), (g), (h), (i), and (j).

There also is record evidence that Trump's management provided regular supervision to the service staff members, including Plaintiffs, indirectly.  This was accomplished by Santini and Sgarro giving various directives and orders as to what had to be done to the banquet captains, including Garcia and Valencia,, who in turn would supervise and direct the work of the service staff members. *Id.* at ¶¶3(a), (b), (c), (e), and (i).

Accordingly, there is record evidence to establish, and at a minimum raise triable issues of material fact, that Trump both directly and indirectly supervised the service staff members, including Plaintiffs.  The second joint employer factor should weigh in favor of a finding that Trump was Plaintiffs' joint employer.

### D.     Right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers.

Based on the record testimony of Fuchs, Merrigan, Fonticiella, Johnson, and even Satz, there is substantial probative evidence to support a jury finding that Trump had the right to both directly and indirectly hire, fire and modify the employment conditions of the service staff workers.  From the standpoint of hiring and modifying the employment conditions of the workers, Fonticiella and Merrigan testified that Garcia was involved in the auditioning process and gave input into who would be selected for the more lucrative server positons and who would be relegated to the less prominent jobs at the event.  *Id.* at ¶¶3(h) and (i).  Indeed, Merrigan testified that Garcia together  with Trump manager Dlugatz **both** were actual decision makers on who was selected as servers from the auditioning process.  *Id.* at ¶3(i).  Satz testified that Valencia, the other Trump-employed banquet captain, was actively involved in the auditioning process and had say in which workers were selected as servers and which were given other jobs. *Id.* at ¶3(k).  That the decision making process had an impact on the terms and conditions of the workers, and even was a determinative factor in what they would be paid, is supported by Satz's testimony that the workers not selected for server positions would be given lesser paying, per diem positions.  *Id.*

Johnson, Fonticiella and Merrigan also testified that Garcia, who throughout the event took her orders from her Trump management "boss" (according to Merrigan), daily created the work schedules for the service staff members, would assign the servers to particular locations to perform their work, would tell the servers when they could take breaks, would communicate to the servers

16

and the other captains the rules and policies of the event,  would tell the workers what they could and could not do and where they could and could not go, and would prepare the guest seating charts with the server station assignments. *Id.* at ¶¶3(f), (g) and (i).  Garcia thus was able to modify the working conditions and work times of all the service staff members on a daily basis.

With regard to the authority to fire Plaintiffs and the other services staff employees, Fuchs testified that Santini was involved in decisions to remove employees from the hotel property for disciplinary reasons, with the assistance of Trump's loss prevention personnel.  *Id.* at ¶3(b).  Both Fonticiella and Merrigan testified that Garcia, acting on her own, terminated and kicked off the property staff members, including a server named Julian who Fonticiella had specifically complained about to Garcia.  *Id.* at ¶¶3(h) and (i).  In fact, Merrigan had witnessed Garcia make these termination decisions on more than one occasion. *Id.* at ¶3(i).  Johnson likewise testified that Garcia and Valencia, like himself as banquet captains, had the authority to discipline staff members, that he had witnessed Valencia send two people home, and that Garcia along with the maître d' had escorted staff members off the premises.  *Id.* at ¶3(f).

Thus, contrary to Trump's position in its Motion, Satz did not "alone" have the authority to hire, fire and modify the work conditions of Plaintiffs and the other service staff employees who worked the event.  There is relevant, admissible evidence that Trump's managerial employees, including Santini and Dlugatz, as well as Trump- branded and represented banquet captains Garcia and Valencia, had such authority and regularly exercised it.  As such, there are genuine issues of material fact that the fourth joint employer factor favors Plaintiff's position that Trump was their employer for purposes of the FLSA.

E.      Ownership of facilities.

"Ownership is relevant because a landowner is thought to have some knowledge of and control over what happens on his land." *Layton*, 686 F.3d at 1180.  This factor weighs fully in Plaintiffs'favor as it is undisputed that the facilities where the 2014 Passover tour event were held, and were Plaintiffs performed their services, were at the TND resort that was at all times owned and operated by Trump.

Contrary to Trumps' argument on this factor in its Motion, given Trump's active involvement, management, control, supervision, and troubleshooting during the event as exercised by its managerial and supervisory personnel (and as more fully discussed above), this factor is not a "throw-away" factor and is highly relevant to the joint employer analysis.  It should not be discounted and should work in Plaintiffs'favor in the joint employer calculus.

F.      Performance of specialty job integral to business.

"A task or activity is considered -integral' to an employer's business when that employer -would be virtually certain to assure that the function is performed, and would obtain the services of whatever workers are needed for this function. [Accordingly, t]he workers so engaged can reasonably anticipate that the work will be available for so long as the function in question must be performed." *Martinez–Mendoza v. Champion Int'l Corp.,* 340 F.3d 1200, 1203, 1213 (11th Cir.2003) (quoting Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed. Reg. at 11,741).

Trump maintained a full-time banquet staff at the TND and had a food and beverage department, which clearly included a banquet director and banquet captains such as Garcia and Valencia.  Providing such banquet and food and beverage services to guests of the TND for group functions held at the hotel would clearly be an integral part of the business of Trump in providing

18

banquet facilities and holding tour and convention events at the TND.  In fact, Trump and its predecessor at the TND resort had done this for Eden Tours and Goldwasser pursuant to a five-year contract.  Banquet servers for Trump's guests, pool servers for serving Trump guests at its pools, and action chefs to cook food for Trump guests all would clearly be performing specialty jobs integral to Trumps' business of providing hotel and resort services for tis guests.  Such jobs, within a hotel or resort, clearly would be part of the "integrated economic unit" – i.e,, the preparation and service of food and beverages to hotel guests at various locations throughout the resort – required to have the jobs considered specialty jobs integral to the hotel's business.  *Antenor,* 88 F.3d at 937.  *See also Tafalla,* 2009 WL 151159, at *8 (finding that dialysis nurses were integral part of dialysis provider because they were part of an "integrated economic unit" within the business).  Accordingly, the seventh joint employer factor should weigh in favor of Plaintiffs and a finding that Trump was a joint employer of Plaintiffs during the Passover event.

**G.     Investment in equipment and facilities.**

Trump admittedly provided the majority of the equipment, tools and facilities that allowed Plaintiffs to perform their work. SOF at ¶25.  This equipment not only included linens, glassware and plates, but also chafing dishes, cups, silverware, trays, tray stands, bottle openers, serving carts, serving equipment, golf carts, and other equipment to be able to perform their work.  The provision of the equipment to the services staff members was overseen by another Trump management employee, Executive Steward Gabriel Navarro.  SODF at ¶25.  Moreover, Trump, through Garcia, provided access to certain facilities, such as banquet offices with Trump-owned computer and printing equipment, to assist the service staff members in performing their jobs, including arranging guest seating for service and creating employee work schedules.  *Id.* at ¶¶3(g) and (i).

Trump attempts in its Motion and SOF to downplay this factor as not being relevant, but without this necessary equipment and tools, Plaintiffs and the other service staff members would not be able to perform their jobs and serve Trump hotel guests attending the event.  This factor weighs in favor of finding Trump Plaintiffs' joint employer under the FLSA.

## V.     Conclusion.

Through its Motion for Summary Judgment, Trump seeks to be absolved of any and all responsibility for Plaintiffs not being paid their hard-earned regular and overtime wages where they (1) worked long hours at an event held at the Trump resort, (2) served numerous Trump guests food and beverages and otherwise attended to the guests' needs throughout the TND property to the financial benefit of Trump, (3) were under the daily control, management, supervision, direction, and disciplinary authority of Trump management and banquet personnel, and (4) were provided and used Trump equipment and facilities to perform their jobs.  As demonstrated above, the record evidence and testimony in this case, albeit disputed and conflicting, are sufficient to support a jury finding that Trump was Plaintiff's statutory "employer" under the FLA's extremely expansive definition of that term.  Trumps' Motion should be denied and this case allowed to proceed to trial.

Respectfully submitted,

RODERICK V. HANNAH, ESQ., P.A.                    ARONFELD TRIAL LAWYERS
Attorneys for Plaintiffs                                          Co-counsel for Plaintiffs
8751 West Broward Boulevard                             3132 Ponce De Leon Boulevard
Suite 303                                                             Coral Gables, FL 33134
Plantation, FL 33324                                          Telephone: (305)441-0440
Telephone:  (954) 362-3800                              Facsimile: (305) 441-0198
Facsimile:  (954) 362-3779                                Email:  aronfeld@arnfeld.com
Email:  rhannah@rhannahlaw.com

By___/s/ *Roderick V. Hannah*_____        By___s/ *Spencer M. Aronfeld*_____
          Roderick V. Hannah                                           Spencer M. Aronfeld
          Fla. Bar No. 435384                                         Fla. Bar No. 905161

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _____ day of February, 2016, a true and correct of the foregoing was electronically filed and served via transmission of Notice of Electronic Filing generated by CM/ECF on all counsel or parties of record on the Service List below:

Jonathan A. Beckerman, Esq.
Florida Bar No. 0568252
E-mail: jabeckerman@littler.com
Jorge Zamora, Jr., Esq.
Florida Bar No. 0094713
E-mail: jzamora@littler.com
LITTLER MENDELSON, PC
333 SE 2nd Avenue, Suite 2700
Miami, Florida  33131
Tel: (305) 400-7500
Fax: (305) 603-2552

*Counsel for Defendant*
*Trump Miami Resort Management LLC*

Eden Tours, LLC, David Goldwasser d/b/a Eden Tours
David Goldwasser
4101 Pine Tree Drive, Apt. 706
Miami Beach, Florida  33104
E-mail:  davidgoldwasser@gmail.com

Defendant Frank Adan, pro se and as
President and Registered Agent for Defendant
ASAI, INC.
6535 SW 22nd Court
Miramar, Florida  33023
(e-mail:  Fadan777@gmail.com)

Defendant Stephen Satz, pro se
5955 Lasalle Street
Lasalle Ontario N2J307
CANADA
(e-mail stephensatz@hotmail.com)

/s/  *Roderick V. Hannah*
Roderick V. Hannah